# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

MANUEL R. SANTOS,

        Petitioner,

        v.

NELSON ALVES,

        Respondent.
_____

Civil Action No.
10-11184-FDS

## MEMORANDUM AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

**SAYLOR, C.J.**

       This is a petition for a writ of habeas corpus by a prisoner in state custody.  Petitioner
Manuel R. Santos is an inmate at Massachusetts Correctional Institution-Norfolk ("MCI-
Norfolk").  Respondent Nelson Alves is the Acting Superintendent of MCI-Norfolk.[1]

       In October 1998, Santos and his co-defendant, Herby Caillot, were convicted of first-
degree murder in Plymouth County Superior Court.  In 2006, the trial judge granted Santos's
motion for a new trial.  The following year, the Massachusetts Supreme Judicial Court ("SJC")
vacated that order and, two years later, denied all remaining claims for direct and post-conviction
relief.  Santos then filed a petition for rehearing in Plymouth County Superior Court.  In July
2011, that court denied his petition, and in February 2012, a single "gatekeeper" justice of the
SJC denied his motion to appeal.

---

[1] Alves, who is currently the facility's acting superintendent, has been substituted as the respondent
pursuant to Fed. R. Civ. P. 25(d).

In July 2010, Santos filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The petition alleges prosecutorial misconduct, violations of Santos's rights under the Confrontation Clause, failure to disclose exculpatory evidence, and ineffective assistance of counsel.  For the reasons below, the petition is denied.

## I.      Background

The facts describing the events of November 19, 1996 and the subsequent trial are taken verbatim from the SJC's opinion, *Commonwealth v. Caillot*, 454 Mass. 245, 247-53 (2009) ("*Caillot II*"), unless otherwise noted.  *See Cooper v. Bergeron*, 778 F.3d 294, 296 (1st Cir. 2015).

### A.      Events of November 19, 1996

At approximately 5:45 p.m. on November 19, 1996, Desmond Campbell was standing with his girlfriend on the front steps of the three-family house in which he lived at 46 Winthrop Street in Brockton, on the corner of Winthrop Street and Warren Avenue, when he observed a green automobile similar to a Dodge Stratus drive by and stop outside his house behind a bus.[2] He observed a black male in the passenger seat staring at him. The same automobile passed by a few minutes later.  A minute or two later, Desmond[3] saw a black male who was approximately six feet tall and who was wearing a black coat, a dark "hoodie" (hooded sweatshirt), blue jeans, and black boots climb down a wall at the nearby house at 451 Warren Avenue.  The man went to

---

[2] There was evidence that a Dodge Stratus is very similar in appearance to a Chrysler Cirrus and a Plymouth Breeze.  There was also evidence that he described the automobile differently on different occasions, one time referring to the automobile as a "green Dodge Stratus or Chrysler Cirrus," and another time solely as a "green Dodge Stratus-like vehicle."

[3] Like the SJC's opinion, this memorandum uses first names where there are multiple witnesses with the same surname.

a white van that was parked in front of the house.  Two other men ran behind the van.  Fearing

that they were enemies (although he did not recognize anyone in the automobile), because he had

gotten into many fights in Brockton, he grabbed his girlfriend and went into his younger brother

Daryl's bedroom on the second floor.  He told Daryl that there were three males across the street.

Daryl opened the bedroom window to see who was outside, and immediately heard the sound of

multiple gunshots.  *Id.* at 247.

      After the shooting stopped, Daryl looked out the window and saw two of the men, both

dark skinned and wearing black clothing (one wearing a hoodie), get into a green automobile

parked up the street.  One man got into the front passenger seat, and the other got into the back

seat behind the driver.  The automobile drove off down Winthrop Street.  The police later

recovered twenty discharged nine-millimeter cartridge casings from the lawn of 451 Warren

Avenue.  No one was injured during the shooting.  *Id.* at 248.

      Desmond's aunt, Phyllis Murphy, and her boyfriend lived in the first-floor apartment at

46 Winthrop Street.  Teriell Murphy and Delicia Turner are Phyllis's children.  The father of

Turner's child was Carlo Clermy, the victim.  *Id.*

      Turner quickly telephoned Teriell.  As a result of the telephone call, Teriell and the

victim drove to 46 Winthrop Street in Turner's automobile, a light blue Honda.  When they

arrived, the police already were there.  They spoke with some of their relatives about what had

occurred and departed in the Honda.  They drove around Brockton, angry, upset, and eager to

retaliate.  *Id.*

      The victim was driving.  While heading west on Nilsson Street, he stopped at a stop sign

at the intersection of Nilsson Street and Warren Avenue, about one-half mile from 46 Winthrop

Street.  As Teriell was trying to light a "blunt" (marijuana cigar), a white tow truck hauling a

station wagon came around the corner.  A light green, four-door Chrysler Cirrus then followed

the tow truck around the corner, to the left of the Honda, shining its headlights on the Honda.

The Chrysler stopped, and the rear door on the driver's side opened.  Teriell ducked down and

slouched in his seat and heard multiple gunshots.  The driver's side window of the Honda blew

out, followed by the passenger's side window, and glass shattered all around.  The victim was

shot.  The Honda drifted forward and to the left and crashed into a utility pole.  *Id.*

Teriell grabbed a nine-millimeter semiautomatic pistol from the victim's waist area and

got out of the automobile.  Teriell saw a shadowy figure wearing dark clothing getting into the

back seat of the Chrysler behind the driver.  The Chrysler drove away, traveling east on Nilsson

Street.  Teriell chased on foot after the automobile, attempting to shoot at it, but the gun would

not fire because the safety was on.  Teriell "cocked the hammer" and a bullet fell to the ground.

Teriell repeatedly fired at the Chrysler, shooting until he had no ammunition left.  The Chrysler

passed the tow truck in front of it, at which time Teriell stopped shooting.  He left the gun near a

shed behind a variety store and returned to the Honda.[4]  Police arrived at the scene at

approximately 6:16 p.m.  The victim died as a result of gunshot wounds to his neck and back.

*Id.* at 248-49.

Officer Thomas M. Spillane of the Brockton police department promptly arrived at the

scene, and asked Teriell, who was shaking and appeared disoriented, what had happened.  Teriell

said he did not know; "[s]omebody just started shooting at us."  *Id.* at 249.

While Officer Spillane was securing the scene, he was directed to go to Good Samaritan

Hospital in Brockton, approximately three miles away, arriving there at approximately 6:40 p.m.

---

[4] When the police later returned to the scene with Teriell to retrieve the gun he had left there, they could not find it.

4

Outside the entrance to the emergency room, Officer Spillane observed a green, four-door

Chrysler Cirrus parked in a spot designated for handicapped drivers.  The rear driver's side

window and the rear passenger's side window were gone, there was glass inside the automobile,

and there was blood on the rear seat and carpet.  *Id.*

Hospital personnel directed Officer Spillane to one of the defendants, Manuel Santos,

who was wearing a dark hoodie and standing near the main door of the emergency room.  Santos

admitted that he had been driving the green Chrysler Cirrus parked outside of the emergency

room.  He stated that he had been heading south on Main Street when someone tried to carjack

him.  Santos explained that someone had started shooting at him during the attempted carjacking,

and he had brought his friend Caillot to the emergency room.  Officer Spillane brought Santos

outside to two other police officers, and told them to handcuff him and place him in the police

cruiser.  One of the officers gave Santos Miranda warnings, which Santos said he understood,

and then handcuffed Santos and placed him in custody in the back seat of a police cruiser.  While

walking to the cruiser, Santos told the officers that he "didn't do anything," but knew who did,

that he had been carjacked, and asked to speak with a particular Brockton police detective, who

was on his day off.  The officer turned the radio inside the cruiser off after placing Santos in the

back seat.  A few moments later, Santos knocked on a cruiser door, and when the officer opened

the front driver's door, Santos asked, "What do you think, I murdered someone?"  At the time,

that officer was not aware that anyone had been killed.  She told Santos that the detectives would

talk to him.  *Id.* at 249-50.

A few minutes later, Detective Arthur McLaren of the Brockton police department

arrived.  He turned off his portable radio and joined Santos in the back seat of the cruiser.  Santos

asked if Caillot "was going to be okay," and the detective said that he had only been shot in the

hand.  Santos told Detective McLaren that he had been driving down Warren Avenue when someone tried to hijack his vehicle.  Detective McLaren asked if Santos knew who had shot at his vehicle, and Santos replied that it was "the same nigger that had shot, who had killed Steven."  Santos stated that Steven was Steven Auguste, Caillot's first cousin, who had been killed three months earlier.  Santos also repeatedly blurted out, "Six feet under or life," and asked Detective McLaren if he knew whether "the other party had died."  Detective McLaren had said nothing about anyone being shot.  *Id.* at 250.

Meanwhile, inside the hospital, Officer Spillane spoke with Caillot, a black male, who lay on a gurney in the emergency room with his right hand heavily bandaged, and blood seeping through the bandage.  Caillot was wearing a navy-blue jacket, black sweatpants, and black sneakers.  Officer Spillane asked him what had happened.  At first, Caillot stated that he could not recall, but later stated that he had been lying in the back seat of an automobile, put his hand in the air, and got shot.  He said he had no idea where it happened.  Soon thereafter, State Trooper Steven Paul Godfrey arrived and advised Caillot of his Miranda rights.  Caillot explained that only he and Santos were in the automobile; Santos was driving.  He said he was lying on the back seat of the automobile with his head behind the driver's seat, heard shooting, put his hand up in the air to pull himself up, and was shot.  Caillot also spoke in the emergency room that evening with another trooper, State Police Lieutenant Michael Crisp, who knew Caillot from his previous investigation of the murder of Caillot's cousin.  Lieutenant Crisp again advised Caillot of his Miranda rights, and Caillot told him essentially the same version of events, but added that earlier that evening he and Santos had been at a friend's house on Warren Avenue,

and decided to go for a ride.[5]  *Id.* at 250-51.

**B.**      **The Trial of Santos and Caillot**

At trial, it was represented that no weapons involved in the shooting had been recovered.

A total of forty-six discharged cartridge casings and one projectile or "live round," all nine-

millimeter in diameter, were recovered from the crime scenes at the house shooting and the fatal

shooting.  As noted earlier, twenty of the forty-six discharged cartridge casings were recovered

from the lawn of 451 Warren Avenue.  Nineteen of the discharged cartridge casings were

recovered from the intersection of Nilsson Street and Warren Avenue.  The remaining seven

discharged cartridge casings and the live round were found on Nilsson Street.  The

Commonwealth's ballistics expert, State Trooper Michael Robert Arnold, testified that the

discharged cartridge casings, based on his microscopic comparisons, had come from three

different nine-millimeter firearms.  He explained that the seven discharged cartridge casings

found on Nilsson Street came from "gun no. 1."  Based on the location of the discharged

cartridge casings, this appeared to be the gun that Teriell had fired at the fleeing green

automobile.  Twelve discharged cartridge casings recovered from the lawn of 451 Warren

Avenue and sixteen discharged cartridge casings recovered from the intersection of Nilsson

Street and Warren Avenue came from "gun no. 2."  Eight discharged cartridge casings recovered

from the lawn of 451 Warren Avenue and three discharged cartridge casings recovered from the

intersection of Nilsson Street and Warren Avenue came from "gun no. 3."  In short, the two

firearms that left cartridge casings on the lawn near the house shooting at 46 Winthrop Street

were also used roughly thirty minutes later in the shooting one-half mile away at which the

---

[5] Caillot knew his friend only as "Ro."

victim had been killed.  *Id.* at 251.

Trooper Arnold also testified that the spent bullets recovered (with one exception) were "consistent with nine millimeter caliber ammunition," but that, without a weapon that could be used for comparison purposes, he could not state that any of the spent bullets came from any of the discharged cartridge casings recovered.  Trooper Arnold went on to state that the discharged cartridge casings from gun no. 1 and gun no. 2 could have been used to fire the projectiles recovered from the victim's body.  *Id.* at 251-52.

The defendants did not testify, but their trial counsel called three witnesses in their defense, including the State trooper who was the case officer for the homicide investigation.  The defense pointed out that no one identified the defendants as the shooters, no murder weapons were found, no confessions were made, and the projectiles recovered from the victim could not be linked to any of the discharged cartridge casings that had been recovered.  The defense also claimed they were the victims of misidentification, eliciting testimony that the front grill of the Dodge Stratus looked different from the front of the Chrysler Cirrus, that one eyewitness thought the automobile fleeing the homicide scene looked like a dark-colored Ford Mustang because it drove so fast, that Turner (the mother of the victim's child) had been followed in her automobile four days before the shooting by two men in a light gray Honda, and that another eyewitness saw someone running south down Warren Avenue after the gun shots had stopped.  The defense challenged the credibility of Teriell, noting that the gun he had used was not found where he said he had hid it, and arguing that the two rear side windows of their Chrysler Cirrus could not have been blown away by bullets he fired while chasing the fleeing Chrysler Cirrus from behind.  The defense maintained that the defendants were victims of an attempted carjacking, not perpetrators of a homicide.  *Id.* at 252.

8

The defense also pointed to several inadequacies in the police investigation, including the loss of physical evidence (Santos's clothing) and the mishandling of some of the ballistics evidence (discharged cartridge casings), and asserted that the police failed to investigate other viable leads that would have revealed the true identity of the shooters.  Last, through cross-examination of Trooper Arnold, the defendants elicited evidence that the discharged cartridge casings recovered at 451 Warren Avenue and at the intersection of Warren Avenue and Nilsson Street matched discharged cartridge casings recovered at other locations before and after November 19, 1996, the date the victim was shot and killed.  More particularly, discharged cartridge casings matching those from gun no. 1 were found at the scene of a shooting that took place on November 25, 1996, just six days after the shooting in this case.  Discharged cartridge casings matching gun no. 2 were found at the scene of a nonfatal shooting that occurred on March 4, 1998.  Discharged cartridge casings matching those from gun no. 3 were found at the scene of two drive-by shootings, one that took place on September 30, 1996, and another that took place on October 2, 1996.  Referencing some of this evidence, the defense argued that the gun Teriell could not locate shortly after the shooting of the victim was quickly used in another shooting, and that gun no. 2 and gun no. 3 were never connected to the defendants.  *Id.* at 252-53.

### C.      Direct Appeal and State Post-Conviction Filings

Following their convictions, Santos and Caillot, still represented by trial counsel, appealed and moved for post-conviction relief based, in part, on prosecutorial misconduct.  In their motions for relief, they asserted that the prosecutor improperly argued motive during his closing statement even though the argument—that the shooting was revenge for the shooting death of Caillot's cousin, Steven Auguste—was not supported by evidence.  The trial judge

denied the motions.

On September 21, 2000, Santos's appeal was first entered to the SJC.  In July 2001, represented by new counsel, Santos again moved for post-conviction relief, which the SJC remanded to the Superior Court for disposition before it considered the direct appeal.  Santos asserted various claims of ineffective assistance of trial counsel and argued that the prosecutor had been "overzealous" in attributing a motive for the victim's death to the defendants.  Echoing a similar appeal by Caillot's appellate counsel, Santos asked for reconsideration of the judge's denial of his first motion for post-conviction relief to the extent that issue had already been considered.

In November 2002, Santos and Caillot amended their motion for post-conviction relief. The amended motion asserted that newly discovered evidence—the pretrial recovery of gun no. 2 and gun no. 3, and information related to the use of those guns in shootings by individuals other than the defendants—warranted a new trial.  They also asserted that that evidence constituted material exculpatory evidence the prosecutor withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

On July 20, 2006, the Superior Court judge concluded a new trial was warranted based on the combined grounds of an improper closing argument by the prosecutor and the newly discovered evidence.  *See Commonwealth v. Caillot*, 2006 WL 5536915 (Mass. Sup. Ct. July 20, 2006).  But on August 16, 2007, the SJC vacated that order after concluding that the prosecutor's closing argument was not improper and that the additional evidence did not warrant a new trial. *See Commonwealth v. Caillot*, 449 Mass. 712 (2007) ("*Caillot I*").  And on July 10, 2009, the SJC affirmed on direct review Santos and Caillot's convictions and denied all remaining motions for post-conviction relief.  *See Caillot II*, 454 Mass. at 247.  On February 10, 2010, the United

States Supreme Court denied a petition for writ of certiorari. *See Santos v. Massachusetts*, 559 U.S. 948 (2010).

On April 26, 2010, Santos moved for post-conviction relief in Plymouth County Superior Court. (Dkt. No. 102, *Commonwealth v. Santos*, No. 9783CR99348 (Mass. Sup. Ct. Apr. 26, 2010)). That motion was denied on July 12, 2011. (Dkt. No. 117, *Commonwealth v. Santos*, No. 9783CR99348 (Mass. Sup. Ct. July 12, 2011)). On August 3, 2011, Santos submitted a "gatekeeper" petition under Mass. Gen. Laws ch. 278, § 33E, asking a single SJC justice for leave to appeal the Superior Court's denial. (Dkt. No. 1, *Commonwealth v. Santos*, No. SJ-2011-0343 (Mass. Aug. 3, 2011)). On February 13, 2012, the gatekeeper justice denied that request. (Dkt. No. 13, *Commonwealth v. Santos*, No. SJ-2011-0343 (Mass. Feb. 13, 2012) (Spina, J.)).

  **D.**  **Federal Habeas Proceedings**

On July 16, 2010, Santos filed this petition for a writ of habeas corpus. The petition asserts six claims:

(1) The prosecution violated Santos's due-process rights during closing arguments by saying that Santos had a motive to murder the victim, commenting on Caillot's post-arrest silence, incorrectly stating that no guns had been found, and vouching for the credibility and character of two of the state's witnesses;

(2) the trial court violated the Confrontation Clause of the Sixth Amendment by admitting Caillot's out-of-court statements without cross-examination;

(3) the prosecution violated the Fifth, Sixth, and Fourteenth Amendments by withholding material, exculpatory evidence in the possession of the state police, including the alleged murder weapons and related documents;

(4) Santos was denied his Sixth Amendment right to effective assistance of counsel

because his attorney decided not to hire a crime-scene reconstruction or ballistics expert to testify and decided not to investigate an alternative suspect;

(5) the SJC deprived Santos of his due-process right to a fair trial by reversing the trial court's order granting a new trial based in part on prosecutorial misconduct; and

(6) the SJC deprived Santos of his due-process right to put on evidence by reversing the trial court's order granting a new trial based in part on the discovery of new firearms evidence. (Pet. (Dkt. No. 1) at 17-18). [6]

The following month, Santos moved to stay his habeas petition to allow his attorney time to file a post-conviction motion contending that a then-newly decided Massachusetts case entitled him to relief.  (Mot. to Stay (Dkt. No. 5)).  On October 5, 2010, then-Magistrate Judge Leo T. Sorokin granted the motion, and the petition was stayed.  (Order Granting Mot. to Stay (between Dkt. Nos. 10 & 11)).

Several years passed, during which time the case was reassigned, and the Court held multiple status conferences and received reports concerning actual or potential state-court proceedings.  On December 6, 2017, the Court issued an order that Santos file the proposed post-conviction motion or otherwise show cause as to why the stay should not be lifted.  (Order to Show Cause (Dkt. No. 70)).  One month later, Santos's counsel withdrew, and Santos moved to extend the stay to give his newly appointed counsel time to review his file.  (Order Granting Mot. Withdraw (Dkt. No. 74)); (Pet.'s Mot. Ext. (Dkt. No. 76)).  Santos successfully sought

---

[6] The body of the petition asks for relief on four grounds, but an appendix entitled "Grounds" mentions the six grounds listed above.  (Pet. at 17).  However, ground five is not sufficiently distinct from ground one to merit separate treatment.  (*Id.*).  The same is true of grounds six and three.  (*Id.*).  Indeed, petitioner's Amended Memorandum of Law in Support of His Petition for Writ of Habeas Corpus identifies only four grounds for relief. (Pet.'s Am. Mem. (Dkt. No. 100) at 12-38).

further extensions through motions filed on May 24 and August 29, 2018.  (Pet.'s 2d Mot. Ext. (Dkt. No. 78)); (Pet.'s 3d Mot. Ext. (Dkt. No. 80)).  On November 14, 2018, the Court denied Santos's motion for a fourth extension. (Order Denying Mot. (Dkt. No. 83)).

On February 4, 2019, Santos's new counsel withdrew.  (Order Granting Mot. Withdraw (Dkt. No. 93)).  He is now proceeding *pro se*.  The legal issues underlying his petition are fully briefed.  (Pet.'s Am. Mem. (Dkt. No. 100); Resp. Mem. (Dkt. No. 105); Pet. Reply (Dkt. No. 108)).

## II.    Standard of Review

### A.    Decisions Reached on Independent and Adequate State-Law Grounds

A federal court may not necessarily review on the merits every claim in a habeas petition. In particular, a federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A state procedural rule is "independent" if it does not depend on a federal constitutional ruling.  *See id.*  A rule is "adequate" if it is "regularly and consistently" applied by the state courts.  *Hodge v. Mendonsa*, 739 F.3d 34, 43 (1st Cir. 2013) (quoting *Pina v. Maloney*, 565 F.3d 48, 53 (1st Cir. 2009)).  An exception to the rule exists when "the petitioner can demonstrate cause for the default and prejudice stemming therefrom, or, alternatively, . . . the petitioner can show that a refusal to consider the merits of the constitutional claim will work a miscarriage of justice." *Barbosa v. Mitchell*, 812 F.3d 62, 67 (1st Cir. 2016) (internal quotation marks and citation omitted).

"A defendant's failure to object in a timely manner at his state criminal trial may constitute an adequate and independent state ground sufficient to trigger the bar rule so long as

the state has a consistently applied contemporaneous objection requirement and the state court has not waived it in the particular case by resting its decision on some other ground." *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). The First Circuit has held, "with a regularity bordering on the monotonous, that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010) (citations omitted). Thus, a Massachusetts court's invocation of the rule bars federal habeas review unless the petitioner can show either cause for the default and actual prejudice or that reaching the merits is necessary to prevent a miscarriage of justice. *See id.* at 44-46.

Even if a Massachusetts court briefly reviews a claim under a miscarriage-of-justice standard, despite a party's failure to preserve that claim by contemporaneous objection, "[t]his discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule." *Id.* at 44. In other words, the state court still decides that claim on an independent and adequate state-law ground. *See id.* As a result, a federal court may not review that claim.

**B.    Claims Reviewed on the Merits by State Court**

If an independent and adequate state-law ground does not preclude review, the scope of that review depends on whether the claim was adjudicated on the merits in state-court proceedings. If it was, a federal court may grant the habeas petition if those proceedings resulted in a decision (1) "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d).  "[A] decision by a state court is 'contrary to' . . . clearly

established law if it 'applies a rule that contradicts the governing law set forth in [Supreme

Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme] Court and nevertheless arrives at a result different from our precedent.'"  *Price*

*v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

If a claim was not adjudicated on the merits in state-court proceedings, then the federal

court reviews the claim *de novo*.  *See Cooper*, 778 F.3d at 299.  "Section 2254(d) thus demands

an inquiry into whether a prisoner's claim has been adjudicated on the merits in state court; if it

has, [section 2254(d)]'s highly deferential standards kick in."  *Davis v. Ayala*, 576 U.S. 257, 269

(2015) (internal quotation marks omitted).  For a federal claim to have been decided on the

merits, it is unnecessary for the state court to explain its reasons in an opinion or to "cite or even

be aware of" Supreme Court case law.  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  "When a

federal claim has been presented to a state court and the state court has denied relief, it may be

presumed that the state court adjudicated the claim on the merits in the absence of any indication

or state-law procedural principles to the contrary."  *Id.* at 99.  Accordingly, here, the Court

presumes that the SJC adjudicated the petitioner's claims on the merits, except as otherwise

noted below.

**III.    Analysis**

**A.    Prosecutorial Misconduct**

Petitioner contends that four statements in the prosecutor's closing argument were

improper and denied him due process.  (Pet. at 6).  Specifically, petitioner contends that the

prosecutor (1) argued a theory of motive without evidentiary support, (2) commented on

petitioner's co-defendant's post-arrest silence, (3) inaccurately stated that no murder weapons

had been found, and (4) vouched for the credibility and character of two of the state's witnesses. *Id.*[7]  The SJC concluded that those statements did not, individually or collectively, violate petitioner's right to due process.

### 1.   Whether the Decision Was Contrary to Clearly Established Federal Law

The first issue is whether the SJC applied a rule contrary to clearly established federal law.  A prosecutor's comments render a trial unconstitutional only when they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  That standard requires courts to consider the effect of the comments in the context of the entire trial. *See id.* at 179.  *Darden* sets a "very general" standard.  *Parker v. Matthews*, 567 U.S. 37, 48 (2012).  Indeed, the First Circuit has explained that under *Darden* "there is no precise federal standard governing due process claims based on a prosecutor's remarks." *Magraw v. Roden*, 743 F.3d 1, 10 (1st Cir. 2014) (quoting *Dagley v. Russo*, 540 F.3d 8, 15 n.3 (1st Cir. 2008)).  Relevant factors include "whether the jury was adequately instructed, the nature and seriousness of the comments, and the weight of the evidence." *Dorisca v. Marchilli*, 941 F.3d 12, 23 (1st Cir. 2019).  Because *Darden* does not create a precise standard, and because, as described below, the SJC considered the appropriate factors, it did not apply a standard contrary to clearly established federal law when adjudicating petitioner's prosecutorial misconduct claims.[8]

---

[7] The petition does not identify the two witnesses for whom the prosecutor allegedly vouched.  The Court understands the petition to refer to Teriell and Detective McLaren, as they were the subjects of the same argument presented to the SJC.  *See Caillot II*, 454 Mass. at 259-60.

[8] The SJC focused on Massachusetts case law.  *See Caillot II*, 454 Mass. at 257-60.  Nonetheless, the factors it considered were, in substance, the same as those considered under federal law.  *Cf. Clements v. Clarke*,

### 2.     Whether the Decision Was an Unreasonable Application of Clearly Established Federal Law

The second issue is whether the SJC unreasonably applied clearly established federal law. The Court reviews the SJC's application of federal law to each claim individually.

### a.     First Prosecutorial Misconduct Claim

During his closing argument, the prosecutor repeatedly referred to revenge for the murder of Caillot's cousin, Steven Auguste, as motive for shooting the victim.  Petitioner contends here that the motive argument was impermissible because (1) the trial evidence did not provide the factual basis for the argument and (2) the prosecutor knew, without disclosing to the jury, that petitioner had later explained to police he thought Auguste's killer was "Buddha Coward," not Teriell Murphy or the victim.  (Pet.'s Am. Mem. at 31-32).

The SJC's decision concerning the prosecutor's motive argument represents a reasonable application of the *Darden* standard.  The decision identified how the evidence might support the prosecutor's argument:

> As we previously stated in *Caillot I*, "the prosecutor's argument concerning motive was supported by evidence at trial, namely, Santos's statements to Detective McLaren that the person who had shot at him and Caillot was 'the same nigger that had shot, who had killed'" Caillot's cousin.  We explained that, "[b]ased on this testimony, the jury could have found that the defendants believed that one or more of the occupants of the other car who shot at them had been involved in the murder of Caillot's cousin.  The prosecutor permissibly argued this inference that was reasonably derived from the evidence."

*Caillot II*, 454 Mass. at 258 (quoting *Caillot I*, 449 Mass. at 720-21) (internal citations omitted).

Based on that evidentiary support for the prosecutor's argument, the SJC reasonably rejected petitioner's prosecutorial misconduct claim.

---

592 F.3d 45, 54 (1st Cir. 2010) ("The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue.").

Even if the prosecutor's motive argument "infected the trial with unfairness," *Darden*, 477 U.S. at 181, the trial court's jury instructions neutralized that unfairness.  The trial court instructed the jurors that "[i]n the course of closing arguments, we had some reference to the issue or the element of motive . . . .  But, you should keep this in mind, that throughout the evidence in our case, we did not receive into evidence any information which indicated that the defendants . . . knew or knew of the victim, Carlo Clermy, or the witness, Teriell Murphy." *Caillot I*, 449 Mass. at 719.  More generally, "the judge explained that closing arguments are not evidence."  *Id.*[9]  Even without the evidentiary analysis and support the SJC identified, the curative instructions alone could reasonably have been found to eliminate any unfairness arising out of the prosecution's argument.  *See, e.g.*, *Hardy v. Maloney*, 909 F.3d 494, 501-02 (1st Cir. 2018) (holding that SJC's determination that trial court's curative instruction redeemed prosecutor's otherwise inappropriate comment was a reasonable application of federal law).

Finally, as the SJC observed in *Caillot I*, petitioner came to suspect Coward based on information received from a third-party source.  *Caillot I*, 449 Mass. at 721-22.  As a result, "[t]he information concerning Coward would not have been admitted in any event, and therefore would not have been determinative, because it constituted classic 'totem pole' or 'layered' hearsay."  *Id.* at 721.  Those observations support the conclusion that the prosecutor's motive argument was not unfair, let alone so unfair as to make the resulting conviction a denial of due process.  Accordingly, petitioner is not entitled to relief on this claim.

### b.  Second Prosecutorial Misconduct Claim

Petitioner next contends that the prosecutor improperly commented on Caillot's post-

---

[9] That instruction factors against all of petitioner's prosecutorial misconduct claims because each relies on statements made during the prosecutor's closing argument.

arrest silence.  (Pet. at 6).  That claim centers on "the prosecutor['s] remark[] that, when Caillot first spoke with police at the hospital, he told them that he did not remember what had happened; and that such conduct was not consistent with that of an 'innocent victim [who should] want to do everything to help the police corral the person [who] shot him.'"  *Caillot II*, 454 Mass. at 259.

The SJC reasonably determined that the prosecutor's statement was not constitutionally impermissible.  To be sure, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."  *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).  However, the SJC correctly observed that "[t]he defendants wrongly characterize Caillot's encounter with the police as occurring 'post arrest.'  Caillot was in a hospital bed and had not been arrested when this initial exchange with police (Officer Spillane) took place."  *Caillot II*, 454 Mass. at 259.  Thus, the prosecutor's reference to Caillot's denying that he remembered what happened does not implicate *Doyle*.  Accordingly, the SJC reasonably applied federal law, and petitioner is not entitled to relief on this claim.

### c.      Third Prosecutorial Misconduct Claim

Petitioner next contends that it was improper for the prosecutor to tell the jury that the weapons used in the crime had not been found.  That argument rests on the post-trial discovery that the prosecutor's statement—although accurately reflecting its knowledge at trial—was inaccurate when made.  (Pet. at 6).

An adequate and independent state-law ground for the SJC's decision may bar the Court's review.  As described above, a contemporaneous objection is necessary to preserve a claim under Massachusetts state law, and petitioner did not object to the statement during the trial.  *See Caillot II*, 454 Mass. at 258-59.  Respondent therefore contends that the Court cannot

review this issue absent cause and prejudice or a miscarriage of justice.  (Resp. Br. at 43-44).

"It is not always easy for a federal court to apply the independent and adequate state

ground doctrine.  State court opinions will, at times, discuss federal questions at length and

mention a state law basis for decision only briefly."  *Coleman*, 501 U.S. at 732.  In *Michigan v.*

*Long*, the Supreme Court held that

> [W]hen . . . a state court decision fairly appears to rest primarily on federal law, or
> to be interwoven with the federal law, and when the adequacy and independence
> of any possible state law ground is not clear from the face of the opinion, we will
> accept as the most reasonable explanation that the state court decided the case the
> way it did because it believed that federal law required it to do so.

463 U.S. 1032, 1040-41 (1983); *see Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (applying

the *Long* presumption to procedural default in state-court criminal matter); *see also Harris v.*

*Reed*, 489 U.S. 255, 266 (1989) (extending *Long* and *Caldwell* to federal habeas context).

Here, the nature of the SJC's decision on this statement is ambiguous.  The SJC noted

that petitioner did not object to the prosecutor's statement on the missing weapon and seemed to

apply, albeit briefly, a miscarriage-of-justice analysis.  *See Caillot II*, 454 Mass. at 258-59.  That

suggests the SJC perhaps considered this claim procedurally defaulted under the

contemporaneous-objection rule and thus did not reach the merits.

However, the SJC also stated that the prosecutor's statement "had a factual, but what later

turned out be erroneous, basis in the evidence at trial."  *Id.*  That statement could be interpreted

as an application of the *Darden* standard (or the Massachusetts equivalent).  Such a conclusion is

particularly compelling because the SJC had concluded, in the preceding paragraph, that another

prosecutorial statement was permissible for a similar reason under a full merits analysis.  *See id.*

at 258 (concluding that prosecutor's statement regarding motive "reasonably derived from the

evidence" at trial).  Finally, the overall context suggests that the SJC reached the merits.  It

would be anomalous for the SJC to rest its decision on the contemporaneous-objection rule while acknowledging that the statement was not known by either side to be erroneous at the time it was made.

Because the SJC only ambiguously invoked an adequate and independent state ground, the Court will assume that the federal question was decided on the merits. *See, e.g.*, *Harris*, 489 U.S. at 266 ("Applying the 'plain statement' requirement in this case, we conclude that the Illinois Appellate Court did not 'clearly and expressly' rely on waiver as a ground for rejecting . . . petitioner's ineffective-assistance-of-counsel claim. To be sure, the state court perhaps laid the foundation for such a holding by stating that most of petitioner's allegations 'could have been raised [on] direct appeal.'" (internal citations omitted)).[10]

The SJC's decision concerning the prosecutor's missing guns argument was a reasonable application of the *Darden* standard. The court concluded that the argument had a basis in the evidence presented at trial. *See Caillot II*, 454 Mass. at 258. In fact, the missing guns, and their use in crimes following the murder of Clermy, were central to the defense's strategy. *See id.* at 252-53. Furthermore, as already noted, "[i]n his instructions to the jury, the judge explained that closing arguments are not evidence." *Caillot I*, 449 Mass. at 719. Accordingly, the SJC did not unreasonably apply federal law, and petitioner is not entitled to relief on this claim.

---

[10] Even if the SJC's decision rested on an independent and adequate state-law ground, petitioner has not shown cause and prejudice or a miscarriage of justice. Certainly, that the defense was unaware that the weapons were found may constitute cause. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) (identifying "that the factual or legal basis for a claim was not reasonably available to counsel" as cause). But petitioner has not shown prejudice or a miscarriage of justice. *See Lynch v. Ficco*, 438 F.3d 35, 45 (1st Cir. 2006) (noting that a court may consider a claim subject to the Massachusetts contemporaneous-objection rule only if petitioner showed cause and prejudice or a substantial likelihood of a fundamental miscarriage of justice) (citing *Coleman*, 501 U.S. at 750).

### d.      Fourth Prosecutorial Misconduct Claim

Petitioner next contends that the prosecutor improperly vouched for the credibility and

character of witnesses in his closing argument.  (Pet. at 6).  This claim appears to refer to the

prosecutor's assertions in his closing argument that (1) "[w]hat [Teriell] did was he told the truth

based on the evidence in this case, based on what could be corroborated.  What he said could

be corroborated independently and by other witnesses," *Caillot II*, 454 Mass. at 259, and (2)

Detective McLaren is a "good detective" and a "good, thoughtful police officer[]."  *Id.* at 260.

There is again some uncertainty whether the SJC's analysis of this claim was based on a

state-law procedural ground or a merits-based examination of the underlying federal issue.  The

SJC wrote, "There was no objection to the alleged instances of vouching.  We therefore review

to determine whether the statements were improper and, if so, whether they created a substantial

likelihood of a miscarriage of justice."  *Id.* at 259.  The SJC went on to consider the propriety of

the "vouching" statements considering the evidence and arguments presented at trial.  *See id.* at

259-60.

Under the circumstances, the Court concludes that the SJC invoked the Massachusetts

contemporaneous-objection rule.  Several factors guide that determination.  First, the SJC tied its

miscarriage-of-justice analysis to the defense's failure to object.  Second, improper vouching is

apparent on its face, and defense counsel could have been reasonably expected to object.  That is

unlike the prosecutor's statement about the weapons (which all sides believed to be true at the

time).  It is sensible that the SJC would more readily apply the contemporaneous-objection rule

in this context.  Finally, although *Michigan v. Long* requires courts to presume a federal merits

examination when the call is a close one, the First Circuit has made clear that a "discretionary

miscarriage-of-justice review [by a Massachusetts court] does not amount to a waiver of the

state's contemporaneous objection rule." *Janosky*, 594 F.3d at 44; *see also Tart v.*

*Commonwealth*, 949 F.2d 490, 496 (1st Cir. 1991) (explaining that federal courts "will not infer

waiver of a contemporaneous objection rule unless the state appellate court has made it

reasonably clear that its reasons for affirming a conviction rest upon its view of federal law"

(internal quotation marks and citation omitted)).  Therefore, the Court is barred from reviewing

this claim absent a showing of cause and prejudice or that "a refusal to consider the merits of the

constitutional claim will work a miscarriage of justice."  *Barbosa*, 812 F.3d at 67 (quoting *Burks*

*v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995)).

Petitioner has not shown cause and prejudice.  He does not claim ineffective assistance of

counsel based on the failure to object; he does not suggest any external impediment that may

have prevented his counsel from objecting; and he does not discuss how the jury would have

been affected had the prosecutor not made these statements.  *See Murray*, 477 U.S. at 488

(identifying two objective impediments that could constitute cause for a procedural default: (1)

"that the factual or legal basis for a claim was not reasonably available to counsel," or (2) "that

interference by officials made compliance impracticable" (internal quotation marks and citations

omitted)); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding that showing

"actual prejudice" requires a petitioner to demonstrate that the alleged errors "worked to his

*actual* and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions").  And certainly neither cause nor prejudice is obvious on the face of the petition or

record before the Court.

Petitioner likewise has not shown a "fundamental miscarriage of justice."  He does "not

argue that he is actually innocent of the underlying offense, and since Massachusetts does not

have the death penalty, the question of actual innocence of the aggravating circumstances

23

rendering the inmate eligible for the death penalty, does not arise." *Lynch*, 438 F.3d at 45 (internal quotation marks and citations omitted).

In any event, even if the SJC's analysis reached the merits, the claim fails because the SJC reasonably applied federal law. "Improper vouching encompasses statements by the prosecutor that place the prestige of the prosecutor's office behind the government's case." *United States v. Vázquez-Larrauri*, 778 F.3d 276, 283 (1st Cir. 2015) (internal alterations, quotation marks, and citations omitted). "[P]ersonal assurance[s] of a witness's credibility" constitute one form of improper vouching. *Id.* at 284

Here, the SJC acknowledged that one or more of the prosecutor's statements *did* resemble an expression of belief as to the credibility of Teriell. *See Caillot II*, 454 Mass. at 259-60. However, it also noted that in the context of the trial and the evidence presented, "the jury would have understood that the prosecutor intended to convey not that he knew what Teriell had stated was truthful, but that Teriell's testimony was credible because there was physical evidence corroborating his testimony." *Id.* (citing *Commonwealth v. Raymond*, 424 Mass. 382, 391 (1997)). Furthermore, the SJC pointed out that the argument was made in direct response to defense counsel's statement that Teriell was "lying through his teeth." *Id.* at 260. Accordingly, it reasonably determined that the statements were not improper. *See Vázquez-Larrauri*, 778 F.3d at 283-85 (rejecting claim that prosecutor improperly vouched for witness's credibility by asking jury "was she telling you the truth?  I submit to you that she was.").

The SJC also reasonably determined that the prosecutor's description of Detective McLaren as a "good detective" and a "good, thoughtful police officer" was not improper. It noted that this statement could be properly inferred from the evidence and, again, was made in direct response to the defense's argument that the detective mishandled the investigation. *See*

*Caillot II*, 454 Mass. at 260.  Furthermore, referring to a witness as a "good detective" is a far cry from opining directly on his truthfulness.

Accordingly, even if this Court did not find that an adequate and independent state-law ground barred review, the SJC reasonably considered the relevant *Darden* factors.

Finally, even when considered in its entirety, the prosecutor's closing argument did not violate the Constitution.  Again, the SJC reasonably concluded that all four statements were not improper.  Evidence supported each statement, which were appropriate in the context of the issues at trial.  Nor is there a reasonable basis to conclude that those statements, taken as a whole, resulted in a constitutional violation.

In summary, the SJC's rejection of petitioner's prosecutorial misconduct claims was a reasonable application of clearly established federal law.  Petitioner is therefore not entitled to relief on these claims.

### B.     Confrontation Clause

Petitioner next contends that the admission of his co-defendant's out-of-court statements violated his rights under the Confrontation Clause of the Sixth Amendment.  (Pet. at 8).

During the trial, the judge admitted into evidence several statements the petitioner's co-defendant, Caillot, made to police officers.  *See Caillot II*, 454 Mass. at 254.  The prosecution introduced those statements through the officers to whom they were made; Caillot did not testify at trial.  Petitioner's trial counsel thus did not have an opportunity to cross-examine Caillot.  His counsel did not request, and the jury did not receive, a limiting instruction to apply the statements only against Caillot.  *See id.* at 254-57 & n.8.  Petitioner contends that the introduction of the statements violated his rights under the Sixth Amendment's Confrontation Clause as interpreted by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004),

*Bruton v. United States*, 391 U.S. 123 (1968), and *Tennessee v. Street*, 471 U.S. 409 (1985). (Pet. at 8); (Pet.'s Am. Mem. at 12-21).

### 1. Whether the Decision Was Contrary to Clearly Established Federal Law

In *Crawford*, the Supreme Court held that under the Sixth Amendment's Confrontation Clause, "testimonial statements" made outside of court are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. In a footnote, the majority added that, in addition to allowing an exception when these two conditions are met, "[t]he Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at n.9 (citing *Street*, 471 U.S. at 414).

In *Bruton*, the Supreme Court held that when multiple defendants are tried jointly, the out-of-court confession of one defendant is admissible only against the confessing defendant, not against any co-defendants. 391 U.S. at 137. Thus, if one defendant's out-of-court confession inculpates another defendant, the right to cross-examination under the Confrontation Clause bars that confession's admission, *id.* at 135-37, unless the confession is offered for a purpose other than establishing the truth of the matter asserted.

In *Street*, the Supreme Court held that a trial court's admission of a facially inculpatory, out-of-court confession by a non-testifying accomplice did not offend the Confrontation Clause when used for a purpose other than establishing the truth of the matter asserted and accompanied by a limiting instruction to that effect. 471 U.S. at 413-14. The Supreme Court held that the jury instruction was "[i]n this context . . . the appropriate way to limit the jury's use of that evidence in a manner consistent with the Confrontation Clause." *Id.* at 417.

Here, petitioner contends that the SJC acted contrary to *Street* by failing to require a

limiting instruction that the statements were not offered for their truth.  (Pet.'s Am. Mem. at 14-

15).  But *Street* is readily distinguishable.  There, the out-of-court confession was facially

inculpatory.  *Id.*  For that reason, admitting it without a limiting instruction would have created

an unavoidable Confrontation Clause issue.  Here, however, the relevant out-of-court statements

were *exculpatory* if believed for their truth.  *See Caillot II*, 454 Mass. at 256.  In other words, the

statements were inconsistent with the prosecution's version of events, and the prosecution was

plainly offering them specifically for their falsity.  Under the circumstances, no limiting

instruction was required.  In fact, a limiting instruction would have been detrimental to the

defense, which argued that the statements should have been accepted for their truth.  *See id.*[11]

The SJC correctly identified *Crawford*, *Bruton*, and *Street* as the governing law and

applied these precedents—reasonably, as described below—to petitioner's contentions regarding

Caillot's out-of-court statements.  *See id.* at 254-57.  Therefore, the SJC's decision is not

contrary to clearly established federal law, and petitioner is not entitled to relief on that basis.

### 2.   Whether the Decision Was an Unreasonable Application of Clearly Established Federal Law

The SJC addressed petitioner's Confrontation Clause claims together.  *See id.*  It

concluded that all but two of Caillot's out-of-court statements introduced at trial were "not

offered for the truth of the matter asserted, but to demonstrate Caillot's state of mind.  The

Commonwealth offered this evidence to argue that Caillot's version of events was intended to be

a lie; it was the defense who argued that it was true."  *Id.* at 256.  Put simply, if the jury believed

the statements, they were exculpatory.

---

[11] In any event, the defense failed to request a limiting instruction.  *See United States v. Walter*, 434 F.3d 30, 35 (1st Cir. 2006) (no right to limiting instruction on use of out-of-court statements when not requested at trial by defense).

As the SJC pointed out, the bulk of these statements involved the story that Caillot told to the police at the hospital.  *See id.*  Caillot told the officers that he was lying in the back of Santos's car when he reached up and was shot in the hand.  *See id.*  But again the prosecution did not offer those statements for the truth of the matter asserted—the statements directly contradict the very factual events the prosecution was trying to prove.  *See id.*  For that reason, the SJC correctly concluded that they did not implicate the Confrontation Clause.  *See United States v. Vassar*, 346 F. App'x 17, 24 (6th Cir. 2009) ("Indeed, the government acknowledged that Fann's statement was 'on its face false.'  The admission of Fann's voicemail message therefore did not implicate Vassar's Confrontation Clause rights.") (citing *Street*, 471 U.S. at 414).

The SJC did, however, conclude that two of Caillot's statements were offered for the truth of the matter asserted.  *See Caillot II*, 454 Mass. at 256-57.  It found that "[t]he jury learned from Caillot's [out-of-court] statements that Santos was driving the Cirrus when Caillot was shot, and that he and Santos earlier had been at Ro's house on Warren Avenue that evening, and could have considered that information against Santos."  *Id.*  Nonetheless, the SJC held that "any error . . . whether characterized as a *Bruton* or *Crawford* error, was harmless beyond a reasonable doubt."  *Id.* at 257.  It found that "Santos himself admitted that he was driving the Chrysler Cirrus when Caillot was shot, and the jury never learned who Ro was or where Ro lived on Warren Avenue, so no adverse inference could have arisen from this evidence regarding Santos's whereabouts before he drove away with Caillot."  *Id.*

### 3.    <u>Harmless Error</u>

Because the SJC concluded that two of the statements in question were arguably admitted in violation of the Confrontation Clause, the Court will undertake its own harmless-error

analysis.[12]

Like other constitutional trial errors, *Crawford* and *Bruton* errors are subject to harmless-error analysis.  *See Harrington v. California*, 395 U.S. 250, 254 (1969).  An error is harmless when a state appellate court, on direct review, is "able to declare a belief that it was harmless beyond a reasonable doubt."  *Chapman v. California*, 386 U.S. 18, 24 (1967).  On collateral review of a state appellate court's application of *Chapman*, federal courts do not apply *Chapman*'s beyond-a-reasonable-doubt standard but instead use an "actual prejudice" standard. *See Brecht*, 507 U.S. at 637.  That standard requires a habeas petitioner to show that the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The *Brecht* test remains applicable following the passage of 28 U.S.C. § 2254.  *See Fry v. Pliler*, 551 U.S. 112, 119-20 (2007); *Connolly*, 752 F.3d at 511.

Petitioner contends that admitting the statements resulted in prejudice because they "were utilized by the Commonwealth to place the Petitioner at the scene of the crime; to support its argument that Petitioner had motive for the murder; as well as for proof of iden[t]ity, intent, and malice."  (Pet.'s Reply Br. at 3).  The Court agrees with the SJC's analysis and therefore concludes that any error was harmless.

First, as the SJC pointed out, petitioner "himself admitted that he was driving the

---

[12] The First Circuit permits two possible approaches to harmless-error determination on collateral review. *See Connolly v. Roden*, 752 F.3d 505, 511 (1st Cir. 2014).  Under one test, a federal habeas court considering a state court's harmless-error determination undertakes a two-step approach:  At step one, the court asks if the state's harmless-error conclusion was reasonable, and if not, the court must inquire if the error had a substantial and injurious effect or influence under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Id.*  Alternatively, a federal court may simply apply the *Brecht* test outright.  *Id.*  The Court will adopt the latter approach as it is more favorable to petitioner and does not affect the outcome.

Chrysler Cirrus when Caillot was shot." *Caillot II*, 454 Mass. at 257.  Accordingly, there was no risk of substantial and injurious effect on the jury verdict from that evidence, as the information was cumulative to petitioner's own statements.  *See, e.g.*, *Barbosa v. Mitchell*, 812 F.3d 62, 69 (1st Cir. 2016) (erroneous admission of "largely cumulative evidence" did not have a substantial and injurious effect on the verdict).

Second, Caillot's assertions that the defendants had been at his friend Ro's house on Warren Avenue could not have had a substantial influence on the jury's verdict.  As the SJC reasoned, because "the jury never learned who Ro was or where Ro lived on Warren Avenue, . . . no adverse inference could have arisen from this evidence regarding Santos's whereabouts before he drove away with Caillot." *See Caillot II*, 454 Mass. at 257.  That evidence was also immaterial—Teriell provided far more specific, corroborated testimony concerning Santos and Caillot's actions on Nilsson Street, the scene of the murder itself. *See id.* at 259-60.  The statement by Caillot, vague and unspecified, was immaterial considering the overwhelming corroborating evidence tying petitioner to the actual murder.

Accordingly, petitioner has not shown substantial and injurious effect or influence on the verdict arising from admitting Caillot's out-of-court statements.  He is therefore not entitled to relief on his Confrontation Clause claim.

### C.   Failure to Disclose Material Evidence

Petitioner next contends that the prosecution violated his due-process rights by failing to disclose evidence favorable to his defense.  (Pet. at 5).  That evidence consisted of guns no. 2 and no. 3 themselves, as well as documentation showing the use of these guns in shootings by individuals other than petitioner and Caillot.  (*Id.*).  According to petitioner, the prosecution incorrectly "represented to defense counsel, to the trial court, and to the jury that the alleged

murder weapons had not been recovered," when they were in fact in state-police custody before the trial began.  (*Id.* at 17).

Upon independent review of the record, the SJC agreed with the trial court that "there was no evidence that the prosecution knew that they had gun no. 2 and gun no. 3 in State police custody, and that no intentional pretrial suppression of exculpatory evidence occurred."  *Id.* at 262.  Accordingly, the SJC found that there was no due-process violation in the failure to disclose that evidence to the defense.  Petitioner now contends that the SJC's conclusion was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. (Pet. at 9); (Pet.'s Am. Mem. at 22).[13]

**1.    Whether the Decision Was Contrary to Clearly Established Federal Law**

The first issue is whether the SJC's decision was contrary to clearly established federal law.  "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "[T]he duty to disclose . . . encompasses impeachment evidence as well as exculpatory evidence."  *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  "Moreover, the rule encompasses evidence known only to the police investigators and not to the prosecutor.  In order to comply with *Brady*, therefore, the individual prosecutor has a duty to

---

[13] Petitioner also states, in passing, that the SJC's findings amounted to an "unreasonable determination of the facts."  (Pet.'s Am. Mem. at 22).  However, he goes no further in developing that argument and focuses exclusively on his legal argument, assuming the facts as found by the SJC.  That argument is accordingly waived.  In any event, the SJC's determination that the police and prosecution had not matched the guns until after trial is well-supported by the evidence, and petitioner points to no evidence or testimony to the contrary.  *See Caillot I*, 449 Mass. at 722-23 (discussing discovery that guns had been in police possession); *see also* Resp. Br. at 31-33 (discussing evidence before SJC of gun-identification timeline).

learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police." *Id.* at 280-81 (internal quotation marks and citations omitted).

Here, the SJC explicitly noted that *Brady* provided the governing law, assessed petitioner's contentions under longstanding Massachusetts interpretations of *Brady*, and concluded that "[t]here was no *Brady* violation here." *Caillot II*, 454 Mass. at 262-63.  Petitioner has not identified any Supreme Court case providing clearly contrary authority.  Indeed, the Supreme Court does not appear to have ever confronted a *Brady* claim in a case where the state possessed evidence that it did not know to be relevant at the time of trial but learned of its relevance years after trial.  Thus, the SJC's decision is not contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1), and petitioner is not entitled to relief on that basis.

### 2.      Whether the Decision Was an Unreasonable Application of Clearly Established Federal Law

The second issue is whether the decision was an unreasonable application of clearly established federal law.  In *Strickler*, as noted above, the Supreme Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police." 527 U.S. at 280-81 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Here, the SJC determined that a prosecutor does not violate that duty when the prosecutor, despite an investigation, failed to learn of potentially favorable evidence because the police themselves did not know that the evidence was relevant.  *Caillot II*, 454 Mass. at 260-63.[14]  The police were unaware of any connection to the case because the forensic examination

_____

[14] The Court assumes, without deciding, that the evidence in question is favorable to the defense.

32

was not conducted until after the trial was completed.  *Id*. at 262.[15]

Petitioner suggests that due process requires a prosecutor to learn of all evidence favorable to the defense that exists at the time of trial—even if the government does not know that the evidence is favorable or even relevant.  (Pet.'s Am. Mem. at 21-30).  That is not, however, a reasonable interpretation of the constitutional standard.  In this case, that interpretation would have effectively required prosecutors to test every firearm in the possession of any law-enforcement agency in the state to determine whether there might be evidence favorable to the defense.  In fact, such a requirement would logically extend beyond firearms, requiring an investigation into all evidence possessed by any law-enforcement agency.  Nor is it obvious that the search should be limited to law-enforcement agencies in Massachusetts.  That interpretation is particularly implausible because, at the time of his trial and of *Strickler*, computerized evidence databases were not widely used.[16]

In any event, the issue is not whether petitioner's reading of *Strickler* is correct; it is whether the SJC's application of the legal standard was unreasonable.  The Ninth Circuit recently faced a similar issue in *Martinez v. Ryan*, 926 F.3d 1215 (9th Cir. 2019).  In that case, a key prosecution witness pleaded guilty to methamphetamine use, including during the time he testified against Martinez.  *See id.* at 1228.  Although the court conceded that "evidence that a witness . . . was using drugs during the trial would reflect on his competence and credibility as a

---

[15] The SJC primarily relied on state cases to this effect in its reasoning, perhaps because petitioner's claim on this issue was also brought under the Massachusetts Constitution's due-process clause.  *See Caillot II*, 454 Mass. at 261-62.

[16] The connection between these weapons and petitioner's case was eventually made using a computer system.  *See Caillot II*, 454 Mass. at 262 n.12.  However, because that technology was in its adoption phase at the time of the trial, "there was roughly a two-year backlog in entering digital images of newly recovered cartridge casings into the Drugfire system."  *Id.*

witness," the *Brady* claim failed because the defendant did not demonstrate "that the prosecution knew, or had a duty to know, of [the witness's] drug use or his drug convictions before the end of Martinez's trial." *Id.* (internal quotation marks and citations omitted). The court held that "*Brady* claims apply in situations that 'involve[] the discovery, after trial of information which *had been known* to the prosecution but unknown to the defense.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Accordingly, "[i]f the prosecution does not discover, or does not have a duty to discover, certain evidence until after the trial ends, then there can be no *Brady* claim against it even if exculpatory evidence later surfaces." *Id.*; *see also United States v. Barroso*, 719 F. App'x 936, 941 (11th Cir. 2018) (finding no *Brady* violation when "there is no evidence the government possessed that information prior to trial, much less suppressed it"); *United States v. Edwards*, 1998 WL 172617, at *2 (10th Cir. Apr. 14, 1998) ("The government's obligation under *Brady* cannot apply to evidence not in existence at the time of the criminal proceeding.").

The SJC's interpretation of a prosecutor's *Brady* obligations mirrors that of the Ninth Circuit in *Martinez*. In both cases, the prosecution learned—after the trial concluded—information that potentially would have been subject to disclosure under *Brady*. And in both cases, there was no plausible argument that the government knew, or should have known, that information prior to the conclusion of trial. In short, the SJC's application of *Brady* was not an unreasonable application of clearly established federal law: The government must share what it knows to be relevant and exculpatory but need not investigate every piece of seemingly unrelated evidence in its possession to determine relevance to a case. Accordingly, petitioner is not entitled to relief on his *Brady* claim.

D.     **Claims for Ineffective Assistance of Counsel**

Finally, petitioner contends that his trial counsel provided ineffective assistance in violation of his Sixth Amendment rights.  His argument stems from his trial counsel's decisions (1) not to hire a crime-scene reconstruction expert or ballistics expert to testify at trial and (2) not to pursue an investigation of Stanley St. Louis, a Warren Avenue resident and owner of a green car, as an alternative suspect.  (Pet. at 11, 17); (Pet.'s Am. Mem. at 35-38).  For the reasons below, the SJC properly found that neither decision rendered petitioner's trial counsel's assistance constitutionally ineffective.

1.     **Whether the Decision Was Contrary to Clearly Established Federal Law**

Claims for ineffective assistance of counsel under the Sixth Amendment must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result.  *Id.* at 687.

The first prong of the *Strickland* test requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  There is a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance."  *Id.* at 689; *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("[C]ounsel's judgments in formulating the defense strategy are entitled to substantial deference.").

The second prong requires a petitioner to show that counsel's deficient performance resulted in prejudice—that is, "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was reliable."  *Strickland*, 466 U.S. at 687.  "To successfully prove prejudice . . . a petitioner must show that, but for counsel's deficient performance, there is a

35

'reasonable probability' of a different outcome, meaning 'a probability sufficient to undermine confidence in the outcome.'" *Chum v. Coyne-Fague*, 948 F.3d 438, 444 (1st Cir. 2020), *petition for cert. filed*, 19-8866 (June 30, 2020) (citing *Strickland*, 466 U.S. at 694).

The SJC evaluated petitioner's ineffective-assistance claims in his consolidated appeal. *See Caillot II*, 454 Mass. at 263-65.  It did so under the "substantial likelihood of a miscarriage of justice" standard set forth in Mass. Gen. Laws ch. 278, § 33E.  *See id.*  That standard requires a defendant to show (1) "there was an error in the course of the trial" and (2) "that error was likely to have influenced the jury's conclusion." *Commonwealth v. Frank*, 433 Mass. 185, 187-88 (2001) (quoting *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992)).  The First Circuit has held that "where the SJC applies its more favorable 'substantial likelihood of a miscarriage of justice' standard, its decision will not be deemed to be 'contrary to' the *Strickland* criterion[.]" *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (citing *Mello v. DiPaulo*, 295 F.3d 137, 144 (1st Cir. 2002)).  Accordingly, the SJC's consideration of these claims was not contrary to clearly established federal law.

### 2. Whether the Decision Was an Unreasonable Application of Clearly Established Federal Law

Because *Strickland* requires petitioner to overcome a presumption of adequate assistance and 28 U.S.C. § 2254(d) permits a habeas court to grant relief only if the state court's application of *Strickland* is unreasonable, the Court's review is "'doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  The Court must take a "highly deferential look at counsel's performance through the deferential lens of § 2254(d)."  *Id.* (internal quotation marks and citations omitted).  In other words, "the pivotal question in a federal collateral attack under *Strickland* is not whether defense counsel's performance fell below *Strickland*'s standard, but whether the state court's application of the

*Strickland* standard was unreasonable, that is, whether fairminded jurists would all agree that the decision was unreasonable." *Jewett v. Brady*, 634 F.3d 67, 75 (1st Cir. 2011) (internal quotation marks and citations omitted).

### a.   Failure to Hire Expert

 Petitioner's first claim is that his counsel's failure to obtain a crime-scene reconstruction or ballistics expert violated his Sixth Amendment right under *Strickland*.  (Pet. at 11).  He alleges that expert testimony would have shown that any bullet Teriell fired while chasing after the fleeing automobile could not have caused the damage to his car.  (*Id.*).

On appeal, the SJC noted that at trial "counsel for both defendants vigorously pursued the very point which present counsel want an omitted expert to have made:  that it should have been physically impossible for bullets to blow out the rear passenger windows [of Santos's automobile] or to strike Caillot's hand from the rear angle of fire reported by [Teriell's] testimony . . . .  This point was not abstruse.  The jury could not reasonably have failed to grasp it."  *Caillot II*, 454 Mass. at 264-65 (brackets in original).  It concluded that there was no error because petitioner had not demonstrated that expert testimony addressing this point would have contributed materially to the defense.  *See id.* at 265.

The SJC's analysis satisfies the constitutional standard.  As the SJC found, petitioner's trial counsel could have reasonably concluded that the defense had sufficiently impeached Teriell's testimony through vigorous cross-examination of the prosecution's witnesses and that nothing more could be gained through expert testimony that could justify the risk and expense of obtaining it.  Furthermore, trial counsel may have concluded that cross-examination was the safer approach to introduce this theory, a common strategic consideration when weighing the benefits of any witness testimony.  *See Phoenix v. Matesanz*, 233 F.3d 77, 83 (1st Cir. 2000)

(noting that deciding to call a witness "is almost always strategic" and requires "a balancing of the benefits and risks of the anticipated testimony" (quoting *Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993))).[17]  That type of decision deserves substantial deference and is not deficient performance within the meaning of *Strickland*.  *See Genius*, 147 F.3d at 66 ("Even when there is no need for an expert or the costs of an expert are borne by the state, pursuing any line of inquiry involves some use of time and distracts in some degree from other possible defenses that might be pursued.").

Furthermore, and in any event, the SJC concluded that petitioner did not show a substantial likelihood of prejudice.  Affirming the trial court's reasoning, the SJC found that testimony from a reconstruction or ballistics expert could not reasonably be expected to have changed the outcome because counsel established, without the help of expert testimony, "the very point which present counsel [on appeal] want an omitted expert to have made."  *Caillot II*, 454 Mass. at 264.  Because the expert testimony would have been cumulative and the point was not complex, the SJC reasonably concluded that no prejudice resulted.

In summary, the SJC's conclusion was a reasonable application of Supreme Court precedent, and petitioner is therefore not entitled to relief on this claim.

---

[17] Petitioner points to an expert retained post-conviction who agrees with his theories.  (Pet.'s Am. Mem. at 34-35).  However, such an expert would have been subject to cross-examination by the prosecution.  It is entirely reasonable for trial counsel to have opted instead to do the cross-examining and not risk having the defense deflated by a successful cross-examination of his own witness.  *See Janosky v. St. Amand*, 594 F.3d 39, 49 (1st Cir. 2010) ("In the circumstances of this case, reasonably competent counsel could have determined that the best defense was a good offense—a no-holds-barred attack designed to discredit the officers' investigation and undermine the reliability of [the prosecution's witnesses]."); *United States v. McGill*, 11 F.3d 223, 228 (1st Cir. 1993) ("[H]aving proved his point through the prosecution's witness, defense counsel can scarcely be faulted for deciding to leave well enough alone.").

### b.   Failure to Investigate Alternative Suspect

Petitioner next contends that counsel committed a *Strickland* error by failing to investigate Stanley St. Louis as an alternative suspect.  (Pet. at 17); (Pet.'s Am. Mem. at 35-38).

The SJC considered that claim in petitioner's consolidated appeal under the same standard of review as the previous claim.  *See Caillot II*, 454 Mass. at 265.  It noted that an evidentiary hearing on the defendants' motions for post-conviction relief brought out evidence that St. Louis lived on Warren Avenue; drove a green, four-door late-model sedan; and had a history of animosity towards Teriell.  *See id.*  The hearing also produced evidence that Teriell and the victim may have initially suspected St. Louis was involved in the shooting at 46 Winthrop Street.  *See id.*  The SJC found that defense counsel knew much of that information before trial and agreed with the trial judge "that the information developed amounted only to speculation regarding the possibility that St. Louis had killed the victim, and was insufficient to demonstrate a culpable failure to investigate or a manifestly unreasonable strategic judgment." *Id.*

The SJC's rejection of the claim was consistent with, and a reasonable application of, *Strickland*.  Trial counsel could reasonably have decided to focus time and resources on rebutting the prosecution's theory of the case rather than affirmatively promoting a speculative alternative. And as observed by the SJC, "[s]ubstantially more information linking St. Louis to the victim's shooting would have been needed for the information to have been considered by a jury at trial." *See id.* (citing *Commonwealth v. Rice*, 441 Mass. 291, 305-06 (2004)).

Again, such a decision concerning defense-strategy formulation is entitled substantial deference.  *See Genius*, 147 F.3d at 66 (citing *Strickland*, 466 U.S. at 689).  The duty to conduct a reasonable investigation "does not invariably require a lawyer, at all times and under all

39

circumstances, to probe every evidentiary lead." *Janosky*, 594 F.3d at 49.  The relevant inquiry

is not what investigation defense counsel "might ideally have mounted but, rather, whether the

choice that he made was within the universe of objectively reasonable choices." *Id.*  Because

petitioner has not demonstrated that trial counsel acted unreasonably by deciding not to spend

more time and resources investigating a speculative theory, he has failed to rebut the

presumption that counsel provided reasonable professional assistance.

Petitioner likewise has not shown that he was prejudiced by his trial counsel's decisions

concerning St. Louis.  Without a showing that this avenue of investigation could have even been

put before the jury, there is surely no showing that the jury result would have been different.

Accordingly, the SJC's conclusion was a reasonable application of Supreme Court

precedent, and petitioner is not entitled to relief on this claim.

### E.      Other Claims

Petitioner includes an attachment to his petition stating a fifth and sixth claim for relief.

(Pet. at 18).  Both claims allege that the SJC's reversal of the trial court's decision to grant him a

new trial deprived him of due process.  These claims, however, simply repackage his claims for

relief directly tied to these grounds and therefore do not merit extensive separate analysis.[18]

The fifth claim—that the SJC's reversal deprived petitioner of his right to contest the

constitutionality of statements in the prosecutor's closing argument—is subject to the same

analysis as his first claim.  The sixth claim—that the SJC's reversal deprived him of his right to

present the evidence that guns no. 2 and no. 3 had been found and were used by other individuals

in shootings—is subject to the same analysis as his third claim.  The fifth and sixth claims simply

---

[18] Petitioner does not address these claims in his amended briefing, and he therefore may be deemed to
have waived them.

repackage the first and third claims by focusing on the SJC's decision, as opposed to the underlying conduct of the prosecutor.  As set forth above, the SJC considered the very arguments petitioner seeks to raise here and adjudicated them reasonably under clearly established federal law.  Section 2254(d) therefore bars the Court from granting the petition based on either the fifth or sixth claims.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  September 18, 2020